Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 63 | **DATE** | September 19, 2002 |
| **CASE TITLE** | *United States v. John Fassnatch and Vincent Malanga* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court DENIES Defendants John Fassnacht and Vincent Malanga's Motions for Bond Pending Appeal [96-1 and 97-1]. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 20 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | | 107 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Hon. Blanche M. Manning |
| v. ) | |
| ) | 01 CR 0063 |
| JOHN FASSNACHT and ) | |
| VINCENT MALANGA ) | |

DOCKETED
SEP 2 0 2002

## MEMORANDUM AND ORDER

Defendants John Fassnacht and Vincent Malanga, pursuant to Federal Rule of Appellate Procedure 9(b) and the Bail Reform Act of 1984 (18 U.S.C. § 3143(b)), have moved this Court for bond pending appeal of their conviction for obstruction of justice. For the reasons set forth below, this Court DENIES Defendants' motions.

Because a complete summary of the indictment and the facts of this case are contained in this Court's July 18, 2002 Memorandum and Order denying Defendants' Motions for Judgment of Acquittal, the Court will only briefly review the facts here.

Defendants were charged with: (1) conspiring to commit tax evasion, in violation of 18 U.S.C. § 371 (Count 1); (2) tax evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2 (Counts 2 and 3); and (3) obstruction of justice, in violation of 18 U.S.C. § 1503(a) (Count 4). The Indictment also separately charged Fassnacht with making false statements to an Internal Revenue Service ("IRS") agent, in violation of 18 U.S.C. § 1001 (Count 5). At the conclusion of the Government's case in chief, this Court granted Defendants' Motions for Judgment of Acquittal as to Counts 2 and 3 and denied the motions as to Counts 1, 4, and 5. After the jury found Defendants not guilty as to Counts 1 and 5 and guilty as to Count 4, Defendants moved

/07

this Court for a judgement of acquittal as to Count 4, which this Court denied. Defendants now come before the Court seeking bond pending appeal of their conviction of Count 4.

## LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3143(b), governs the issue of release pending appeal by a defendant. The statute provides that a court may allow a convicted defendant to remain free on bond pending appeal if: (1) the defendant is not likely to flee or pose a danger to the community; (2) the appeal is not for the purpose of delay; and (3) the appeal raises a "substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a sentence that reduces the term of imprisonment." 18 U.S.C. § 3143(b). See also United States v. Ashman, 964 F.2d 596, 598 (7th Cir.1992); United States v. Greenberg, 772 F.2d 340, 341 (7th Cir.1985).

Here, the first two inquiries – likelihood of flight and danger to the community – are not at issue. Thus, the sole contention is whether Defendants have raised a substantial question of law or fact likely to result in reversal, an order for a new trial, or a reduced sentence.

Section 3143(b)(1)(B) places the burden on the defendant to show that: (1) the appeal presents a "substantial" issue; and (2) the substantial issue will "likely" affect the validity of the conviction. United States v. Shoffner, 791 F.2d 586, 588 (7th Cir. 1986); United States v. Bilanzich, 771 F.2d 292, 298 (7th Cir. 1985).

An issue is substantial if it presents "a close question or one that very well could be decided the other way." Shoffner, 791 F.2d at 589. While "[t]his standard does not require the district court to predict the outcome of the appeal[,]" United States v. Hattermann, 853 F.2d 555, 557 n. 6 (7th Cir. 1988), the court must find "that the appeal could readily go either way, that it is

2

a toss-up or nearly so." Greenberg, 772 F.2d at 341. This interpretation is based in part on the fact that Congress enacted section 3143(b) in part to reverse the presumption in favor of bail under the Bail Reform Act of 1966 and "gives recognition to the basic principle that a conviction is presumed to be correct." Bilanzich, 771 F.2d at 298.

Next, the defendant must then demonstrate that the substantial issue will likely affect the validity of his conviction. See Shoffner, 791 F.2d at 588; Bilanzich, 771 F.2d at 298. The court therefore "must determine whether a contrary appellate ruling is likely to require a reversal of the conviction or a new trial." Id. The defendant thus must do more than show that an error occurred at trial, the defendant must persuade the court that "the appellate court is more likely than not to reverse the conviction or order a new trial on all counts for which imprisonment has been imposed." Bilanzich, 771 F.2d at 298.

Following these principles, the court must "return its attention to its own analysis of these issues at earlier stages of the proceedings[,]" Shoffner, 791 F.2d at 589, and provide a statement of its reasons for granting or denying the defendant's motion for bond pending appeal. See United States v. Swanquist, 125 F.3d 573, 575-76 (7th Cir. 1997).

With these principles in mind, the Court now turns to the arguments raised in Defendants' Motions for Bond Pending Appeal.

## ANALYSIS

Defendants raise essentially the same arguments that were rejected by this Court in its July 18, 2002 Memorandum and Order denying Defendants Motions for Judgment of Acquittal. Essentially, Defendants contend they are entitled to bond because there is real possibility that the Seventh Circuit could find that: (I) the conduct proven at trial did not violate section 1503; or

3

(II) Count 4 failed to adequately apprise Defendants of the charge of obstruction of justice. The Court will address each of these contentions in turn to determine if there is a substantial question of law or fact that is likely to result in a reversal or a new trial.

I.      **Obstruction of Justice Under Section 1503**

Defendants contend that based on United States v. Schwartz, 283 F.3d 76 (2d Cir. 2002) and United States v. Aguilar, 515 U.S. 593 (1995), the Seventh Circuit could find that the conduct proven at trial did not violate section 1503. While the Court believes that this issue was sufficiently addressed in its prior Memorandum and Order, the Court will nevertheless examine these cases and the Seventh Circuit's decision in United States v. Furkin, 119 F.3d 1276, 1282 (7th Cir. 1997), which this Court relied on in denying the motions for judgment of acquittal, in determining whether Defendants have presented a "substantial question of law or fact likely to result in reversal or a new trial."

Before discussing these cases, however, the Court will briefly reiterate the history and purpose underlying the enactment of section 1503. Under section 1503(a) (the "catch-all provision"), a defendant is guilty of obstruction of justice by "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes or endeavors to influence obstruct or impede, the due administration of law." 18 U.S.C. § 1503(a). Congress enacted the "catch-all provision" to ensure that criminal defendants could not "circumvent the statute's purpose by devising novel and creative schemes that would interfere with the administration of justice but would nevertheless fall outside the scope of § 1503's specific prohibitions." United States v. Cueto, 151 F.3d 620, 630 (7th Cir. 1998). In accordance with Congress' intent, courts interpret this provision to "cover a broad spectrum of conduct" so as "to promote the administration of justice and to prevent the miscarriage of justice." Id. at 631.

4

Consequently, courts hold that the defendant does not need to successfully obstruct the administration of justice to fall within the scope of section 1503. Id. at 633. See also United States v. Bucey, 876 F.2d 1297, 1314 (7th Cir. 1989)("the impossibility of accomplishing the goal of an obstruction of justice does not prevent a prosecution for the endeavor to accomplish the goal").

Interpreting the "catch-all provision," the Second Circuit, in Schwartz, 283 F.3d at 80, 110, overturned the conviction of several police officers for conspiracy to obstruct a federal grand jury by lying to investigators regarding the participation of one of the officers in an assault. In reversing the convictions, the Second Circuit found that the evidence at trial failed to show that when the defendants made the false statements to the investigators that they intended for the statements to be presented to a grand jury. Citing Aguilar, the Second Circuit held that to prove specific intent to obstruct justice, the government had to show that the defendants took the alleged actions knowing that they would have the "natural and probable effect of obstructing" the grand jury. Id. at 109.

The court found that the defendants did not know that their alleged false statements given to the federal investigators would be presented to a grand jury because the defendants had not been called to testify before the grand jury, the only subpoena issued was for one of the defendants' notebooks, and the investigators did not indicate that their statements would be repeated to the grand jury. Id. While the defendants might have "hoped that [the false statements] would be provided to the grand jury, and surely there was that possibility," the court found that there was insufficient evidence for the jury to reasonably conclude that the defendants "knew" the statements would be submitted to the grand jury. Id. "At best, the government

proved that [the defendants], knowing of the grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation." Id.

In reaching its decision, the court in Schwartz relied on the Supreme Court's decision in Aguilar. In Aguilar, the Court held that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct [justice under section 1503]." 515 U.S. at 599. The defendant in Aguilar, a United States District Court Judge, was convicted under section 1503 for lying to FBI agents who were investigating an alleged conspiracy to influence the outcome of a habeas case. Id. at 600. The Court found the evidence offered by the government to be insufficient to support a conviction for obstruction because the government failed to show "that [the defendant] knew that his false statement would be provided to the grand jury." Id. at 601. The evidence showed that the defendant lied to the investigating agent but before giving the false statement, asked the agent whether he was the target of a grand jury investigation. Id. The agent responded by stating "[t]he is a grand jury meeting. Convening I guess that's the correct word. Um some evidence will be heard I'm . . . I'm sure on this issue." Id. According to the Court, "[s]uch conduct . . . falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself." Id. at 601. The difference between these situations, according to the Court, lies in the fact that in the latter case, it is "all but assure[d] that the grand jury will consider the material in its deliberations," while the "use [that] will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative." Id. As a consequence, the Court concluded that the defendant's lying to the investigating agents "cannot be said to have the natural and probable effect of interfering with

6

the due administration of justice," and thus could not constitute grounds for a conviction of obstruction of justice. Id.

In contrast to Aguilar and Schwartz, the Seventh Circuit, in Furkin, 119 F.3d at 1283, affirmed a conviction for obstruction of justice under section 1503. Relying on Aguilar, the court noted that the knowledge and intent elements of section 1503 are interconnected in that to sustain a conviction, the government must show that defendant's alleged action "must have [had] the natural and probable effect of interfering with the due administration of justice." Id. at 1282.

The defendant in Furkin was the owner of a company which was in the business of leasing amusement machines, e.g., pool tables and video game machines, to bars and restaurants. Id. at 1278. In addition, the defendant leased illegal gambling machines and failed to report the profits on these machines to the IRS. Id. At trial, the jury found that the defendant obstructed justice by having businesses who leased the gambling machines sign "backdated" leases and by continuing to split the profits on the machines with those businesses. Id. at 1282.

On appeal, the defendant argued that the government failed to show that he had the requisite intent because he never told the owners who signed the backdated leases "to submit the false or backdated leases to the grand jury," and therefore, at most, he only intended the backdated leases to be used in an IRS investigation. Id. In rejecting this argument, the court noted that the defendant's company was served with a grand jury subpoena, and therefore, the defendant was aware of the grand jury's investigation after that time. Id. The court also found that the evidence showed that at least one of defendant's customers testified at trial that the defendant told him that he was being investigated by the IRS and wanted the customer to "lie to the grand jury about the lease." Id. Likewise, the evidence showed that the defendant persuaded other customers to sign backdated leases when he knew that they would be testifying before the

7

grand jury. The court found that the defendant knew that the information regarding the leases was information sought by the grand jury, and therefore, even though the leases were given to the IRS, the defendant knew that they would wind up before the grand jury. Id. at 1282-83. Consequently, even though the witnesses never specifically testified that the purpose of the backdated leases was connected to the grand jury investigation, the court found that there was sufficient evidence to support a conviction under section 1503 because the defendant's actions had the "natural and probable effect" of interfering with the grand jury investigation. Id.

Here, based on the above authorities, Defendants contend that there was insufficient evidence presented at trial to show that they knew or should have been aware that the IRS agent they spoke to after LPM received the grand jury subpoena would testify or present evidence to the grand jury. While this might be one interpretation of the evidence, as this Court thoroughly discussed in its prior Memorandum and Order, evidence that Defendants lied to the IRS was not the sole basis of the Government's evidence that Defendants corruptly intended to endeavor to obstruct the grand jury. For example, a week after the search warrants were served at LPM's offices as part of the grand jury investigation, on April 1, 1996, the grand jury issued a subpoena to Fassnacht requiring him to provide documents related to LPM and ADIA. The same day on which the subpoena was issued, Fassnacht was interviewed by Agent Tice. Over the next couple of days, April 2-3, 1996, Malanga discussed the grand jury investigation with Fassnacht and Newell, in particular, the proposed false testimony which Ed Burke and Fassnacht would present to the grand jury. In a conversation recorded by Newell on April 3, and played at the trial, Malanga specifically stated that Fassnacht's grand jury testimony was postponed. Newell testified that during a meeting between himself and Defendants, regarding the planning of the Burke story, the grand jury investigation was specifically discussed. Moreover, Fassnacht

8

admitted, in a conversation taped by Newell, that he had not turned over all the documents requested in the grand jury subpoena.

Furthermore, the Government presented evidence showing that Malanga and Fassnacht conspired to ensure that Burke would "back-up" Defendants' story to the IRS. In exchange for providing the finders fee story, Burke was to receive ten to twenty percent of the funds from the Bermuda account. To corroborate Burke's story, Fassnacht stressed to Newell the importance of having Burke provide an invoice or "any other documentation" for the work he allegedly did for LPM in 1994. Likewise, Malanga told Newell that they would have to put together documents to support Burke's story. Subsequently, at Defendants' direction, Newell received a false invoice from Burke in Switzerland for $1.35 million for a finders fee he allegedly earned in 1993-94 for introducing ADIA and LPM. Additionally, Newell, at the direction of Defendants, created a false "itinerary" setting forth the chronology of the false finder's fee story.

Consequently, based on the totality of the evidence presented at trial, even applying a narrow reading of Aguilar and Schwartz, this Court finds that this case is closer to Furkin and that Defendants have failed to present a sufficient argument that there is "close question" regarding the sufficiency of the evidence as to Defendants' intent to obstruct justice under section 1503(a).

II.     **Sufficiency of Count 4**

Defendants further contend that the Court should grant them bond on appeal because there is a realistic possibility that the Seventh Circuit could find that Count 4 failed to adequately apprise them of the charge of obstruction of justice and that this Court should have granted their pretrial motions for a bill of particulars.

9

As discussed in some detail in this Court's prior opinions, this Court finds that it is unlikely that the Seventh Circuit would find Count 4 was impermissibly vague. Count 4 tracks the language of section 1503 in alleging that from "approximately March 26, 1996 and continuing thereafter until in or about May 1996" Defendants "did corruptly endeavor to influence, obstruct and impede the due administration of justice namely, Federal Grand Jury investigation number 96 GJ 258 in the Northern District of Illinois." Count 4 incorporates by reference paragraphs 1-26, which further detail the obstruction of justice allegations against Defendants. Paragraphs 10-26 detail Defendants' scheme to concoct a plan to end the grand jury investigation. The plan called for Ed Burke to come forward and falsely state that the $1.35 million in the LPM Inc. account in Bermuda was a finder's fee which he earned for introducing LPM to ADIA. In exchange for this story, Burke was to be paid 10 to 20 percent of the $1.35 million. To corroborate Burke's story, Defendants conspired to prepare false documents including invoices, corporate records, and phone and travel records. In addition to the Indictment itself, the Government provided Defendants with the tapes and transcripts from Newell, which further detailed the obstruction of justice allegations. Consequently, this Court finds that there is not "a close question" as to whether Count 4 sufficiently apprised Defendants of the charges against, and therefore, Defendants' are not entitled to bond pending appeal.

## CONCLUSION

For the forgoing reasons, this Court DENIES Defendants John Fassnacht and Vincent Malanga's Motions for Bond Pending Appeal [96-1 and 97-1]. It is so ordered.

ENTER:         *Blanche M. Manning*
               **BLANCHE M. MANNING**
               **U.S. DISTRICT COURT JUDGE**

DATE: **SEP 1 9 2002**

11